## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS
## HOT SPRINGS DIVISION

ROBERT EDMUND BROWN
a/k/a ROBERT LEE BROWN                                                    PLAINTIFF

VS.                          NO. _____

CAROLYN S. GWINN;
LENORA ANN SMITH a/k/a LENORA G. SMITH
a/k/a LENORA WIGGINS a/k/a LENORA ALLEN;
SAFECO INSURANCE COMPANY OF ILLINOIS;
and ENTERPRISE RENT-A-CAR COMPANY
OF TENNESSEE, LLC                                                        DEFENDANTS

### COMPLAINT

COMES Plaintiff, Robert Edmund Brown a/k/a Robert Lee Brown, an adult citizen and

resident of Garland County, Arkansas ("Plaintiff" or "Brown"), by his undersigned attorney, Larry

J. Steele, of Larry J. Steele PLC, and for his Complaint against Defendants, Carolyn S. Gwinn

("Gwinn"), Lenora Ann Smith a/k/a Lenora G. Smith a/k/a Lenora Wiggins a/k/a Lenora Allen

("Smith"), Safeco Insurance Company of Illinois, an Illinois insurance corporation ("Safeco"), and

Enterprise Rent-A-Car Company of Tennessee, LLC, a Delaware limited liability company

("Enterprise"), states:

### SUPPLEMENTAL JURISDICTION

1.      "Except as provided in subsections (b) and (c) or as expressly provided otherwise

by Federal statute, in any civil action of which the district courts have original jurisdiction, the

district courts shall have supplemental jurisdiction over all other claims that are so related to claims

in the action within such original jurisdiction that they form part of the same case or controversy

under Article III of the United States Constitution. Such supplemental jurisdiction shall include

claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). Many of the state law claims asserted herein by Brown as hereinafter set forth can be heard by this Court as a matter of supplemental jurisdiction.

## STATEMENT OF FEDERAL JURISDICTION

2.      This is a civil action under 18 USC §1964)(a)(c)("Civil RICO" for Racketeer Influenced and Corrupt Organizations Act ("RICO") remedies authorized by 18 U.S.C. § 1961, et seq., for declaratory and injunctive relief, for actual, consequential and exemplary damages, and for all other relief, both legal and equitable, which this Court deems just and proper under all circumstances which have occasioned this Complaint. This Court has subject matter jurisdiction to enter a declaratory judgment under 28 USC § 2201 et seq. as part of the relief requested.

3.      The primary cause of this Civil RICO action and basis for requested relief is a criminal enterprise of which Defendants were members engaged in a pattern of racketeering activity across state lines, and formation of a conspiracy to engage in racketeering activity involving numerous RICO predicate acts committed during the past ten (10) calendar years.

4.      Defendants were at all relevant times members of "an association in fact" existing in conspiratorial and illegal purpose.

5.      The predicate acts alleged here involving Defendants cluster around an automobile accident in 2018 in Garland County, Arkansas, eventually resulting in intimidation by Safeco and Enterprise of Brown regarding the settlement of a Brown insurance claim and use of an Enterprise rental car, coupled with the fraudulent use of Plaintiff's debit card by Enterprise as a means of further harassment and intimidation of Brown. Defendants agents included but were not limited to harassment and threats by confrontation of Brown while at one of his physician's offices. Such willful and intentional acts caused Brown both physical pain and emotional damage, aggravated

his suffering, invaded his privacy and embarrassed him in the presence of third parties having no need or privilege to know the details of his health status and suffering, all in possible violation of applicable HIPPA privacy provisions.

6.      The primary objective of the racketeering enterprise has been to inflict severe and sustained economic hardship upon Brown while he was disabled from the subject collision and unrepresented by counsel, with (a) the intent of impairing, obstructing, preventing, and discouraging him from settling his insurance claim for fair value, and (b) obtaining his rightful use of a rental car available under Smith's automobile liability policy replacing his seriously damaged and disabled personal vehicle herein after described.

7.      This Court has original jurisdiction of this action pursuant to the federal Civil RICO act remedies at 18 U.S.C. §§ 1964 et seq., and the holdings of the U.S. Supreme Court in *Tafflin v. Levitt*, 493 U.S. 455 (1990).

8.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 USC § 2201 et seq. and personal jurisdiction over the parties pursuant to Ark. Code Ann. § 16-4-101 and other applicable provisions of Arkansas law as (a) Gwinn and Smith are long time citizens and residents of the state of Arkansas; Safeco and Enterprise are foreign corporations qualified to do business in the state of Arkansas; (b) Safeco and Enterprise are foreign corporations qualified to do business in the state of Arkansas with appointed agents for service of process who are conducting for profit substantial regular business in this state at multiple locations.

9.      Venue is established under 28 USC § 1965 and the corresponding provisions of state law including but not limited to A.C.A. § 16-4-101 as the subject matter of this action is the personal injury of the Plaintiff and loss of his property as a result of an automobile accident which occurred in Garland County, Arkansas, within the Western District of the state of Arkansas; and,

subsequent intentional acts perpetrated by the Defendants Safeco and Enterprise as explained hereinafter which caused and still cause harm and damage to Plaintiff in the Western District of the state of Arkansas.

10.    A civil RICO (Racketeer Influenced and Corrupt Organizations Act) action is therefore alleged against Defendants Gwinn, Smith, Safeco and Enterprise not just based on the automobile accident and its immediate aftermath, but on extortion, attempted fraud, and Safeco's and Enterprise's robbery of Brown by the unauthorized use in interstate commerce of one of his credit cards in their attempts made under duress to secure an agreement of settlement from Brown regarding (a) his purported claims against Safeco's insured, Defendant Smith, and themselves; and (b) regarding  Brown's use and possession of a rental car owned and leased by Defendant Enterprise and subsequent nighttime repossession thereof, preceded by threats of criminal prosecution. The latter events occurred while Brown, still in the process of recovering from his painful injuries, had no other method of transportation to keep scheduled medical appointments and get prescriptions refilled in aid of his recovery.

## PARTIES

11.    Brown is an adult citizen of the state of Arkansas, residing at Royal, Garland County, Arkansas 71968 within the boundaries of the Western District of Arkansas.

12.    Gwinn is an adult citizen of the state of Arkansas, residing at 610 Logan Gap Road, Mount Ida, Montgomery County, Arkansas 71957 within the Western District of Arkansas, and can be served at that address.

13.    Smith a/k/a Lenora G. Smith a/k/a Lenora Wiggins a/k/a Lenora Allen is an adult citizen of the state of Arkansas, residing at 726 Southwest Drive, Apartment M-1, Jonesboro, Craighead County, Arkansas 72401, and can be served at that address.

14.     Defendant, Safeco Insurance Company of Illinois ("Safeco"), upon information and belief, is an insurance company duly organized and doing business under the laws of the State of Illinois, and is qualified to do insurance business and is in fact transacting business for profit in the state of Arkansas.

15.     Defendant Safeco is the agent of its insured, Defendant Smith and had authority to act on her behalf at all times relevant herein. This Defendant is a member of the Civil RICO "enterprise" referred to above in paragraphs 2-4. Safeco has aided and abetted the other Defendants' civil RICO violations on many occasions as hereinafter explained.

16.     The appointed Safeco agent for service is The Corporation Service Company, 300 Spring Building, Suite 900, 300 South Spring Street, Little Rock, Pulaski County, Arkansas 72201, where it can be served in this action.

17.     Defendant, Enterprise Rent-A-Car of Company of Tennessee, LLC,("Enterprise") upon information and belief, is a foreign Limited Liability Company organized under the laws of the state of Delaware, and is qualified to do and is in fact transacting business for profit in the state of Arkansas. At all relevant times, Enterprise has been and is now engaged in car, van and truck leasing and related businesses in the Western District of Arkansas; and, particularly for purposes of this action, in the City of Hot Springs, Garland County, Arkansas.

18.     Defendant Enterprise is the agent of Defendant Smith and Safeco in dealings with Brown and others; and, is a member of the Civil RICO law "enterprise" for all purposes set forth herein.

19.     The Enterprise agent for service is The Corporation Company, 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201, where Enterprise can be served in this action.

## FACTUAL BACKGROUND AND HISTORICAL ALLEGATIONS
## COMMON TO ALL COUNTS

20.     On or about May 9, 2018, at 5:02 p.m., Plaintiff Brown, as the driver of his personal vehicle below described, and while exercising ordinary care under the circumstances then and there prevailing, and not violating any rules of the road applicable to him under Arkansas law, was stopped in traffic, sitting in his owned 2010 Kia Soul vehicle ("the Brown vehicle"), headed west on Albert Pike Avenue (U.S. Hwy. 270) within the City of Royal, Arkansas, in rural Garland County. This portion of the highway was a construction zone at the time of the accident in question; and, while exercising ordinary care under the circumstances then and there existing for his own protection and that of other motorists, Brown had stopped the Brown vehicle due to a construction worker in the roadway regulating traffic with a hand-held stop sign.

21.     Defendant Gwinn was traveling behind Brown in a 2002 Ford Explorer, a heavy vehicle, at a high rate of speed, and was distracted by (a) "texting" and (b) upon information and belief by a conversation with the front passenger seat occupant. Upon observing the texting, road security detail called ahead to a person or persons unknown to Brown, stopping all traffic after observing the Gwinn vehicle approximately one-half (1/2) mile before the point of impact. According to Crawford Construction Company, the paving contractor who had control of the construction zone "set up" where the accident occurred, the "safety zone" started approximately one and one half (1½) miles before the posted flagger, with vehicle speed reduced to 25 miles per hour (mph). The construction zone had a flashing sign sixteen (16) feet in height warning "BE PREPARED TO STOP." Alongside the zone perimeters were vehicles with flashing and strobe lights to slow down motorists.

22.     Donna Gwinn, upon information and belief a family member of Defendant Gwinn, was a front seat passenger/witness in the entrusted vehicle recklessly driven by Gwinn following

the Brown vehicle too closely. Donna Gwinn unless found to be a member of the enterprise is not a party directly responsible to Brown for the damages claimed by Brown in this action from both Gwinn and Smith. But Smith is jointly and severally liable to Brown for all relief requested as a tort-feasor along with Gwinn as explained more particularly below.

23.     Defendant Gwinn negligently failed to stop her speeding, out of control heavier vehicle, ultimately colliding with the rear portion of the Brown vehicle. The proof will show that the Gwinn vehicle left approximately 45 feet of skid marks before the collision, and another 50 feet after impact. Both vehicles were damaged beyond repair and were towed to a salvage yard.

24.     Brown's vehicle sustained disabling damage and was not drivable as a result of the negligence of Defendants Gwinn and Smith. The floor of the Brown vehicle buckled as it was lifted into the air causing the seat in which Brown was buckled for his safety to turn to the left due to the force of the impact.

25.     Gwinn's vehicle sustained disabling damage due to her own negligence and the negligence of Smith. Brown at all times herein mentioned was free of negligence and was not responsible for the collision and the injuries/damages that he suffered and is still suffering resulting therefrom.

26.     Brown, a handicapped elderly person, as a proximate result of the rear end collision, was knocked momentarily unconscious and seriously injured. Brown, once he regained semi-consciousness, at first refused medical transport and asked to be taken home, a distance of some two (2) miles from the accident scene.

27.     Brown has a justifiable fear of hospitals as do many seniors.

28.     Brown, prior to the accident, although elderly and disabled to some extent, led an active life swimming on almost a daily basis and was involved with YMCA and church activities.

7

The subject collision has aggravated old Brown injuries and has destroyed his ability to maintain and enjoy a physically active life as he now has difficulty with "balance" and suffers extremely debilitating headaches. These conditions, resulting from the collision or in the alternative aggravated by it, to a medical certainty will continue for the rest of Brown's life.

29.      Brown sustained serious bodily injury and permanent physical impairment as a result of Gwinn's negligence in failing to act with due care under the circumstances then and there prevailing; in failing to keep a proper lookout for other vehicles, in speeding, in texting, in distracting conversations with passenger Donna Gwinn, and in following the Brown vehicle too closely to avoid a collision with Brown's forward positioned vehicle. Smith is also jointly and severally liable to Brown under Arkansas law for negligent entrustment of a motor vehicle as explained below.

## BROWN MEDICAL HISTORY AND PROGNOSIS

30.      On May 21, 2018, shortly after the collision, Brown, now age 75, had an appointment with his oncologist to discuss blood in his urine (a never before occurring condition) which was determined to be caused solely by trauma due to the motor vehicle accident involving some of the parties hereto that occurred on May 9, 2018.

31.      Brown had been under the care of his oncologist for cancer treatment since 2006, following his diagnosis with Stage 4 advanced osteosarcoma. The cancer has metastasized/ spread to the soft organs. After more than 150 treatments, the tumor necrosified. In 2007, the tumor and one half of the tibia in one of Brown's legs were successfully removed.

32.      On November 23, 2015, as a result of additional medical tests cancer was again detected in Brown's body, with the diagnosis made of acute myeloid leukemia (AML), high white cells. After two (2) years of treatment the AML is now chronic and no longer acute.

33.     At the time of the accident complained of herein, Brown was in a weakened condition and continues to be; and, the trauma from the 2018 collision only aggravated his then poor bodily condition and increased dramatically his pain and suffering. Brown fears that his cancer that has been in remission may return due to ongoing stress, anxiety and worry that he has suffered at the hands of the Defendants since the collision, all as explained more particularly herein in considerable detail.

34.     Brown was seen on the above date (May 21, 2018) by Dr. Clayton Nash of National Park Medical Center who stated to a medical certainty that the hematuria (blood in the urine) was proximately caused by trauma from the subject accident, as was the acute cervical strain and the minor concussion that Brown suffered.

35.     These injuries have debilitated Brown; and, in addition to losing seven (7) pounds since the 2018 accident, he has become weak and frail because of a TIA (Transient Ischemic Attack) caused by the events described in Count Three hereof. A TIA is summarized as a brief stroke, often called a ministroke like attack that requires immediate medical attention to avoid a subsequent more serious stroke. Subsequently, on or about May 13, 2019, Brown indeed suffered a debilitating stroke.

### COUNT ONE: CLAIM FOR NEGLIGENCE OF CAROLYN S. GWINN

36.     Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-35 as if fully set out herein word for word.

37.     While it is not known if Gwinn was impaired or under the influence of alcohol or any other legally forbidden controlled substance at or before the time of the accident herein that she caused, that matter is still under investigation and will definitely be a subject of discovery.

38.     Gwinn was charged with a violation of Ark. Code Ann § 27-51-104, Careless and Prohibited Driving, to which she would enter a plea of guilty and receive a sentence of six (6) months' probation and a fine of $195.00, including costs.

39.     The collision described above and the ensuing injuries were proximately caused by Gwinn, who is guilty at a minimum of the below acts of negligence which either caused or contributed to the occurrence of the collision and the ensuing Brown injuries, medical expense, pain and suffering, emotional distress, property loss, and other damages. Such acts/omissions of Gwinn consisted of, but are not limited to, the following constituting ordinary and/or gross negligence and reckless misconduct in operating a motor vehicle:

a.      Failing to keep a proper lookout while operating her vehicle;

b.      Failing to keep her vehicle under proper control by using excessive speed and following the Brown vehicle too closely; in fact, there were caution and work zone signs for a mile and one-half prior to Defendant Gwinn hitting Plaintiff Brown;

c.      Inattention and distraction due to texting and distracting conversations with front seat passenger Donna Gwinn;

d.      Failing to use ordinary care otherwise in operating/controlling her vehicle under the circumstances then and there prevailing;

e.      Violating other laws, both civil and criminal, of the state of Arkansas prior to the collision, including some or all applicable rules of the road codified in the Arkansas statutes regulating the use and operation of motor vehicles so as not to cause injury or property damage to others in this state; and

f.      Breaching her duty to other motorists to use ordinary care in the areas of (a) through (e) above; which breaches of these duties were the proximate cause of Brown's personal injuries and property damage.

40.     As a direct result of the reckless and negligent misconduct of Gwinn above set out, Brown suffered injuries to his neck (cervical strain), along with other injuries to his body and internal organs not yet fully determined, and is unable without incurring constant pain and

suffering perform some or all significant bodily functions, activities and duties that he was able to perform prior to the herein described vehicular accident.

41.     Brown has experienced significant persistent pain and discomfort throughout the day, seven (7) days a week, and can no longer sleep through the night in his own bed or in any other bed without pain and discomfort. Brown experiences considerable pain and discomfort while riding in a vehicle for long trips. Such is unlikely to abate in the foreseeable future, and is a permanent condition/injury to a medical certainty.

42.     Prior to the 2018 accident and beginning in or about 2006, Brown suffered from cancer as above explained. The subject collision complained of has exacerbated and aggravated his weakened condition due to the new injuries suffered. Most likely his life will be shortened as a result. In any event, his ability to enjoy life has been seriously diminished, and this will to a reasonable certainty continue for the rest of his natural life.

43.     Brown seeks monetary damages for all of the above and, in addition, the following:

   a.     For the nature, extent, duration, and permanency of his injuries;

   b.     The reasonable expense of any necessary medical care, treatment, and services rendered in the past and the present value of such expenses reasonably certain to be required in the future to be proven and resolved at trial;

   c.     For his pain, suffering, and mental anguish experienced in the past and reasonably certain to be experienced in the future for the remainder of his life;

   d.     The present value of in-home help expenses reasonably certain to be required in the future, together with the cost of purchased or rented medical equipment needed for his rehabilitation;

   e.     Property damage to the Brown vehicle;

   f.     Loss of use of his vehicle;

g.      Diminishment of his ability to enjoy life and shortening of his life as a result of the collision proximately caused by the negligence of Gwinn and Smith; and

h.      Punitive or exemplary damages against Gwinn and Smith supported by the proof submitted at trial.

## COUNT TWO: NEGLIGENT ENTRUSTMENT BY SMITH

44.     Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-43 as if fully set out herein word for word.

45.     The 2002 Ford Explorer driven by Defendant Gwinn was owned at the time by Defendant Smith. It is not known when and why such vehicle was entrusted to Gwinn by Smith.

46.     Smith is a four-time convicted felon of drug related charges.

47.     Smith, prior to and at the time of the collision herein referenced, again for reasons unknown to Brown, was entrusting the 2002 Ford Explorer that she owned to another person, Defendant Gwinn. Upon information and belief, this vehicle disabled in the collision may have been part of a "caravan" used to transport, sell, possess and deliver illegal drugs for profit in violation of numerous applicable state and federal laws prohibiting such felonious conduct. The above facts are still under investigation by Brown which investigation has not been completed.

48.     Upon further information and belief, some evidence of such illegal drug activity was or may have been removed from the Garland County accident scene by Gwinn and/or Smith or Richard Gwinn, a 20-time convicted felon of drug related charges, not known to Brown acting on their behalf. A "mirror" was or may have been left behind on the floorboard of the Smith owned vehicle entrusted to Gwinn. It is not known what property items, if any, were discovered/inventoried by the Arkansas State Police ("ASP") officers working the accident scene, or exactly what items, if any, were or may have been removed from the accident scene by anyone

because all items were removed by Richard Gwinn before the police were able to inventory the automobile driven by Defendant Gwinn.

49.     Upon information and belief Smith knew or reasonably should have known that Gwinn through an association with her, mutual friends and others for years, had a history of impairment and drug abuse, and was possibly impaired, and/or incompetent, and/or inexperienced in operating a motor vehicle under such circumstances existing at the time of the collision. Gwinn herself was grossly reckless in operating the 2002 Ford Explorer in which Donna Gwinn was also a passenger. But upon information and belief, the latter in disregard of her own safety took no action whatsoever to cause Gwinn to slow or stop the entrusted vehicle and park it before harm was caused by her to others.

50.     The entrustment orchestrated by Smith created an unreasonable risk of harm to others including Brown.

51.     Smith's negligence in entrusting the vehicle to Gwinn under the circumstances proximately caused Brown's injuries and damages of which he complains herein.

52.     For their negligence and misconduct, Defendants Gwinn and Smith are jointly and severally liable to Brown in monetary damages that the jury will find for all loss, bodily injury, and property damage that he has suffered and will continue to suffer in the future for the rest of his life, together with interest, costs and attorney's fees, as applicable.

### COUNT THREE:  SAFECO AND ENTERPRISE CIVIL RICO LIABILITY

53.     Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-52 as if fully set out herein word for word.

54.     On May 10, 2018, Safeco was notified regarding this loss involving its insured. It was reported that Brown's 2010 Kia Soul was rear-ended by Gwinn's operated 2007 Nissan

Murano while Brown was stopped in traffic. Safeco admittedly accepted 100% liability the same day and advised Brown with the particulars of a purported rental arrangement being set up for his benefit.

55.     On May 20, 2018, Safeco's adjuster, Lori Moore ("Moore"), was assigned to handle the bodily injury portion of the claim and contacted Brown the same day. Brown, in a weakened disabling condition from the May 9 accident, stated erroneously that he was not seriously injured and did not seek treatment at the time of the accident. Part of this response was his fear of hospitals of which he wanted no part. And further lack of knowledge about his then medical condition including without limitation internal injuries later diagnosed.

56.     Safeco agreed to provide Plaintiff Brown with Gwinn's medical records in exchange for Brown giving Safeco a HIPAA release for Brown's medical records.  Although Brown complied with the agreement, Safeco has yet to produce Gwinn's medical records.

57.     On May 16, 2018, Safeco's Total Loss Adjuster, Fernando Suarez ("Suarez"), was assigned to handle the damage inspection of Brown's vehicle and identified $4,528.35 in damage. On the same day, the vehicle valuation was obtained by Brown and showed the vehicle valued at $5,371.25. The vehicle was determined to be a "total loss".

58.     On May 26, 2018, Suarez attempted to contact Brown to explain the "total loss" settlement, rental cutoff, and the next steps in the claim adjustment process. Suarez left a detailed voicemail with the total loss amounts and explained that the documents would be mailed to Brown since he did not use email. Suarez requested a return call. The total loss settlement package was sent the same day with UPS tracking number 1Z1X01621391810223.

59.     Safeco extended the rental to May 20, 2018, as the Brown vehicle was confirmed to be a total loss, and an offer to settle a portion of the claim not made in good faith was extended to Brown.

60.     On May 21, 2018, Suarez contacted Brown to follow up on the total loss settlement offer he had made on behalf of Safeco. Brown stated that he was uncomfortable with speaking with two (2) different adjusters, and that he did not understand how the physical damage and bodily injury claims could be settled separately. Brown, not being an attorney and without funds to hire one, justifiably feared that a release of one of the claims that he was being compelled to sign under duress might also release or diminish significantly the other to his financial detriment. Suarez confirmed that liability was accepted by Safeco on May 10, 2018. Brown then requested Moore to settle the entire claim. Suarez explained that Moore would continue to handle the bodily injury portion of the claim and Suarez would settle the vehicle total loss portion. No reason was submitted to Brown for this "split handling". Brown continued to be confused by this process since he had not retained an attorney to advise him, even for his bankruptcy.

61.     Due to the delay in Brown receiving the total loss settlement documents, rental was extended by Safeco through May 22, 2018. Suarez advised Brown of the new cutoff date. Brown stated that he would not return the rental car until he replaced his seriously damaged vehicle determined by Safeco to be a total loss with another with carrier settlement monies in a fair amount. Brown explained that being in bankruptcy and impoverished with significant medical expenses, he had no other funds from any source to make such an acquisition.

62.     Suarez explained to Brown that Safeco owed for rental from the time settlement was made, not until the vehicle was replaced. Suarez then advised that Brown could contact his carrier if he wanted to be provided with rental for a longer period of time.

63.     On May 21, 2018, Moore contacted Brown to inquire on treatment status, bills, and to further explain the role that she and Suarez would play in settling his claim. Brown stated that he was currently at the doctor due to the presence of blood in his urine. This had not occurred before, and he was very concerned that his cancer that had been in remission for years might have returned. He quickly became upset, cursing at Suarez, stating he would contact his attorney if he could find one, and then ended the call.  Moore and Suarez continued to call Brown for over two (2) hours.

64.     Medical release authorization forms were sent to Brown the same day. At all times pertinent, Enterprise and Safeco, from medical records obtained by medical authorizations from Brown, knew or should have known of Brown's lengthy cancer history and the treatment that he was and had been getting for years to prevent a reoccurrence. These Defendants also knew or should have known of Brown's extremely poor financial condition from Brown's pro se bankruptcy filings of public record.  Safeco agreed to provide Plaintiff Brown with Gwinn's medical records in exchange for Brown giving Safeco a HIPAA release for Brown's medical records.  Although Brown complied with the agreement, Safeco has yet to produce Gwinn's medical records.

65.     Suarez told Brown, in a harassing and threatening manner, to sign for it (presumably the settlement documents) and send it back and accept Safeco's offer of $5,300.00. Suarez told Brown that he had to return the rental car regardless; Suarez threatened to file criminal charges against Brown if he did not.

66.     Lori Moore called Brown while Brown was in his doctor's office. Brown's blood pressure, as a result of the call, went up to 220/192. Brown had a stroke, a TIA (Transient Ischemic Attack), previously mentioned in ¶ 35. This further caused his health to deteriorate and his anxiety

to increase dramatically. On May 13, 2019, Brown would suffer a debilitating stroke and would be hospitalized for approximately one (1) week.

67.     Suarez and Lori Moore were on the phone together, in an act of joint harassment and bad faith in handling his claims, and offered Brown $250.00 for" pain and suffering". This, as Safeco and Enterprise well knew, was not a good faith offer for the bodily and emotional injuries suffered by Brown and was calculated to take advantage of Brown's desperate situation, both physically and financially.

68.     Brown pro se filed for an emergency order of "medical necessity" in bankruptcy court regarding the rental car, having failed to reach a resolution with Safeco and Enterprise.

69.     On May 22, 2018, Moore spoke with Brown, who was requesting the bodily injury settlement be finalized. Brown had reason to believe that Safeco would deal in good faith and fair dealing and follow Arkansas law requiring such claims settlement conduct as a matter of state policy. Moore, as evidence of bad faith, knowing of Brown's insolvency and bankruptcy filing in April 2018, in disregard of the bankruptcy automatic stay of 11 U.S.C. 362 or a separate stay order that may have been entered under 11 U.S.C. 105 or under the inherent powers of the U.S. Bankruptcy Court, offered without getting relief from the stay the token "settlement" of $250.00 for "generals" with no medical presented. Moore explained that medical records and bills were needed from Brown or his medical providers in order to further "review" the settlement. Brown, being without personal injury counsel, refused the offer made in obvious bad faith for purposes of harassment and delay; and stated that he would get a lawyer.

70.     On May 22, 2018, Suarez contacted Brown and approved the rental through May 28, 2018, due to the delay in the settlement documents being delivered, and further explained that the completed documents were needed from Brown. Brown then demanded a rental vehicle at

Safeco's cost through the repairs being completed. Suarez explained that Brown's vehicle was not repairable, and that in accordance with company policy rental was extended four (4) days after the settlement offer was made whether or not it was accepted. Brown stated to Suarez not to call him again and ended the call due to what he perceived to be continuing harassment and bad faith dealings by Safeco and Enterprise through their agents.

71.    On May 24, 2018, certain United States Bankruptcy Court documents were received in the Safeco file, showing that Brown without counsel had on April 19, 2018, filed a *pro se* Chapter 13 petition for relief in his bankruptcy. This case was later converted to Chapter 7 on May 1, 2018.

72.    At the time this action is commenced, the unliquidated claim against Safeco having occurred Post-Petition is no longer in litigation in the Bankruptcy Court because it is not "property of the estate" based on action taken by the Bankruptcy Court or Brown's appointed Chapter 7 trustee and, therefore, is not subject to the automatic stay. No payments, including any advance or one made under reservation of rights, have been issued to Brown by Safeco as a show of good faith even though no agreed settlement has been reached; and upon information and belief no further medical documents have been received by Safeco notwithstanding that Brown has done everything within his control including the signing of authorizations for the release of medical records to get them to the Safeco claims people. Safeco has contended that it needed all medical records and bills in order to review and complete an evaluation. To date, it appears only the hospital bill has been received. Safeco further contended that it needed the records that coincide with the visit. This request, according to Safeco, was communicated to Brown on May 22, 2018. Brown has sent all medical records in his possession to Safeco and has in addition executed a medical authorization. Brown is without fault in getting medical records to the Defendants.

18

73.     Suarez, Lori Moore and Kyle Matusoss ("Matusoss"), an agent of Defendant Enterprise, attempted to use Plaintiff's debit card twice for $300.00, with prior warnings by Brown that this was not authorized and was in his view attempted theft. An agent of Enterprise, one Matusoss, finally withdrew the balance in Brown's account, $50.00, without Brown's permission or consent and likely in violation of a bankruptcy stay order.

74.     Matusoss continued his harassment, Mafia tactics, the next day telling Brown for some inexplicable reason that the rental car provided or to be provided was to be reported "stolen." Brown was never offered an explanation. This further evidence of harassment caused Brown additional stress and anxiety. His health further deteriorated.

75.     Suarez and Moore, acting on behalf of Safeco within the scope of their authority, continued their relentless demands and harassment of Brown as more particularly described previously and hereinafter.

76.     Moore, acting on behalf of Safeco, called Brown again on June 4, 2018, despite the fact that she knew a court hearing in Brown's bankruptcy was scheduled and an attorney had been retained by Safeco. Safeco and Enterprise, each with competent bankruptcy counsel, knew or should have known that Brown had the protection of the bankruptcy court automatic stay or a separate stay order from creditor harassment.  On June 4, 2018, between the hours of 1:00 and 4:00 p.m., Safeco and Enterprise, acting through their agents, called and pressured Brown making unreasonable demands for payment of rental car fees, knowing full well of his recurring and ongoing pain and suffering from the above collision and the blood in his urine; and, as a result thereof, his inability to conduct business or find employment to pay said fees.

77.     At 11:31 p.m. on June 18, 2018, Suarez and Moore had Brown's rental car towed despite the stay. As a result Brown had no means of transportation. He was forced to borrow a friend's car.

78.     The deputy sheriff threatened to arrest Brown upon the occasion of the early morning repossession, but let Brown get his personal belongings before supervising the towing of the car from Lake Ouachita to Hot Springs.

79.     The attorney for Enterprise threatened to prosecute Brown. The district manager for Enterprise threatened to have Brown arrested after the Bankruptcy Court having jurisdiction of Brown's case refused to dismiss or grant relief from the automatic stay.

80.     Defendants knew in a variety of ways by personal contact, telephone conferences, and records acquired that Brown is elderly, handicapped and infirmed due to a recent post-collision stroke, described above. But that acquired knowledge did not serve to stop the ongoing harassment of Brown.

81.     As further proof of the harassment and "bad faith" that Brown had to endure, Enterprise made itself a purported "creditor" in the Brown Chapter 7 bankruptcy over the objection of Brown by claiming a "contract" with Brown which was not assumed post-petition by his trustee and by claiming a debt that was purportedly owed but with no court approval after Brown sought protection from harassment and oppressive misconduct under the U.S. Bankruptcy Code, as amended.

82.     Matusoss, an agent of Enterprise, obtained Brown's personal information regarding his debit card on the pretense of putting gas in the rental car loaned to Brown. Enterprise did successfully withdraw $50.00 from Brown's account but was seeking more. That, with knowledge of the above judicial stays and after repeated warning, Enterprise, in an illegal manner, collected

monies and repeatedly attempted to use Brown's debit card to collect even more without the knowledge of or authority of Brown, but at the direction of Enterprise management. This purportedly, but illegally, "solidified" Enterprise's purported creditor relationship with Brown, but for purposes not known to this day by Brown. This was done in violation of the court order staying all collection procedures against Brown.

83.     Defendants Safeco and Enterprise colluded to violate the standing orders of the court and violation of 11 U.S.C. 362(a), prohibiting interference with property of the estate and the acquisition unlawfully of property from the estate, and ignored injunctive relief ordered by the Bankruptcy Court and the automatic stay to the extent applicable.

84.     Injunctive relief was sought by Brown under 11 U.S.C. § 362(b) and granted by the Honorable Ben Barry, U.S. Bankruptcy Judge on approximately June 26, 2018, granting Brown the continued possession and use of the rental vehicle belonging to Enterprise and made available to Brown for a short period of time. A copy of the order is attached hereto as Exhibit "A". The order affirms the automatic stay pursuant to Brown's bankruptcy.

85.     Despite said stay order protecting Brown, Safeco had the Enterprise rental vehicle towed at the request and direction of the Garland County Sheriff's Office at 2:00 a.m. in the morning, over Brown's objection. A copy of the records of the Sheriff of Garland County memorializing this incident is attached hereto as Exhibit "B".

86.     Although the attorney for Enterprise is believed to be on retainer, upon information and belief, he advised both Enterprise and Safeco employees since at least June 6, 2018, if not earlier, as to how to proceed.

87. The attorney for Enterprise continuously denied service of documents upon him and filed a frivolous motion for relief and emergency motion pretending that he had not been informed of the court date for a hearing.

88. Since May 11, 2018, and as of the commencement of this action, Safeco and it employees/agents have relentlessly acted with both malice and indifference to Brown in conjunction with actions of employees/management of Enterprise. These acts made in conspiracy with the other Defendants were calculated to cause and did in fact cause physical injury, a TIA, and continuing undue stress and mental anguish suffered by Brown resulting in his disabling stroke suffered May 13, 2019.

89. All the "negotiations" with Safeco and Enterprise were willfully conducted by them working together in bad faith to prevent Brown from having transportation and money to seek medical attention for both his cancer and the injuries suffered in the subject collision.

90. Agents of Safeco and Enterprise, knowing Brown to be impoverished, in bankruptcy, vulnerable, and suffering from the above serious medical conditions impairing his judgment and cognitive functions, used their superior bargaining position and economic resources to intimidate, extort, threaten with prosecution and demean Brown in order to force "a settlement." This effort failed.

91. Moore and Suarez, adjusters employed by Safeco, as earlier recited, began "tag teaming" Plaintiff in such a fashion that his blood pressure rose to 212/190 and he suffered a TIA in his doctor's office, Dr. Manjusha Kota, on May 21, 2018, being treated for Hema urethra. This was the first time Brown had suffered such a medical condition, done while Plaintiff was in his doctor's office for treatment, followed or met there by uninvited agents of Safeco. These Safeco committed acts occurred in the presence of other patients and greatly embarrassed Brown; and,

disrupted/embarrassed the medical staff at Dr. Kota's office where Brown was seeking treatment, contributing to the above overall medical injury suffered. This is documented.

92.    Moore and Suarez, on behalf of Safeco, continued their intentionally abusive and harassing actions for several different days. They advised Brown inter alia that he must accept Safeco's offer or "it would cost him," and that he had four (4) days to get transportation.

93.    While Brown was in a hospital bed and in earshot of the National Park Hospital nursing staff in Hot Springs, Suarez on behalf of Safeco called again in a threatening abusive manner warning Brown to sign the release papers and telling Brown that he would not release his vehicle to him or settle the property damage claim until he did so; and by not signing the release, "it would cost him." It was never explained how.

94.    These traumatic injuries directly and solely resulting from the collision in question, and the combined post-collision acts of the Defendants and their agents, have debilitated and frustrated Plaintiff; and, in addition to losing seven (7) pounds since the accident, Brown has become frail because of the TIA and subsequently on May 13, 2019, suffered a debilitating stroke.

95.    Plaintiff due to his injuries from the collision and the post collision relentless harassment, coupled with lack of funds, has not been able to look for a car to replace the one "totaled" by Safeco as part of the claim adjustment process and deemed not repairable. Since Safeco unconditionally accepted liability of its insured upon being notified of the Brown claim, there was no excuse, amounting to bad faith, for not settling at least the Brown property damage claim. Brown, in an act of desperation, was forced to borrow a vehicle from a friend. This individual justifiably now wants the vehicle returned.

96.    The relentless actions and conduct of Safeco and Enterprise, through its agents duly authorized, amount to extreme and outrageous willful/intentional conduct that is so outrageous in

character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society.

97.     The aforementioned actions, conduct, and misconduct of Defendants Safeco and Enterprise, acting by their agents, Suarez, Moore and Matusoss, and possibly other employees/ managers within the scope of their authority, were done willfully and wantonly amounting to extreme emotional and outrageous conduct.

98.     Such conduct has proximately caused damage to Plaintiff in the nature of ongoing emotional distress. The actions of Defendants Safeco and Enterprise taken against Plaintiff Brown resulted in unabated continuing emotional distress for Brown in reckless disregard of the consequences.

99.     The damages for the tort of outrage are to be set by the jury.

## COUNT IV.  CIVIL RICO TREBLE DAMAGES AGAINST ALL DEFENDANTS

100.    Brown restates, realleges, and incorporates herein the allegations in paragraphs 1-99 as if set out word for word herein.

101.    Defendants Gwinn, Smith, Safeco, and Enterprise were an "association in fact" existing as an "enterprise" for the purpose of performing both legal and illegal acts as more fully described herein to damage Brown.

102.    Plaintiff Brown seeks equitable as well as legal damages relief by way of treble damages from said enterprise, inclusive or distinct and separate from any recovery from Defendants Gwinn and Smith, 18 U.S.C. §§ 1964, 1962.

103.    An element of a civil RICO relationship exists among the Defendants and the enterprise, specifically, fraud and intimidation. 18 U.S.C. § 1962

104.    Brown has satisfied and will prove the following elements of a civil RICO claim:

    a.    the existence of an enterprise;

    b.    the defendants' derivation of income from a pattern of racketeering activity; and

    c.    the use of any part of that income in acquiring an interest in or operating the enterprise.

105.    In addition, there must be a nexus between the claimed violation and the plaintiff's injury, which must flow from the use or investment of racketeering income. All of the elements above have been alleged and will be satisfied at trial.

106.    The term "enterprise" as defined in the Act, includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. RICO applies to both illegitimate and legitimate enterprises.

107.    The term "Racketeering activity" has been defined broadly under the Act in order to embrace any act indictable under a host of federal statutes, in both civil and criminal cases. Court have held that the RICO Act's applicability is not limited to members of organized crime and hence no connection with organized crime need be shown. The RICO Act provides for criminal penalties of imprisonment, fines, and forfeiture for violation of its provisions. 18 U.S.C. § 1963. The Defendants' acts and conduct constitute "Racketeering activity" within the meaning of the Act.

108.    A RICO violation requires proof of a "pattern of racketeering activity," through "at least two acts of racketeering activity, the last of which occurred within ten years." RICO is liberally construed in order to effectuate its remedial purposes. In order to establish a pattern, the plaintiff should prove a relationship between the acts of racketeering activity charged and a threat of continuing activity, or continuity of such activity.

109. Brown has stated a claim for relief for a civil RICO violation including treble damages.

110. Brown reserves the right to amend this Complaint and join other parties for a full and fair adjudication of all claims, including the civil RICO claims herein asserted.

### COUNT FIVE: TORT OF BAD FAITH

111. Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-110 as if fully set out herein word for word.

112. Plaintiff Brown alleges a claim for the tort of bad faith against Defendant Safeco.

113. The tort of bad faith is an extension of the well-established rule through which a liability insurance company can be held accountable in tort for failure to settle a claim within policy limits.

114. Brown's claim, based on the tort of bad faith, includes affirmative misconduct by the insurance company, Safeco and its agent, Enterprise, without a good faith defense as to its insured's liability, that the misconduct was dishonest, malicious, and oppressive in an attempt to avoid its admitted liability without a reservation of rights under an insurance policy Safeco issued. The position of Safeco and Enterprise is not justified and not based on a good faith denial of any material facts having admitted liability or alternatively the lack of factual basis for any good faith defense of the Brown claim for personal injuries.

115. Actual malice, of agents of Safeco and Enterprise, is that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge. Actual malice is inferred from conduct and surrounding circumstances. Bad faith gives rise to either first or third party claims. The proof will show that the Defendants are guilty of having committed all these elements as part of their outrageous conduct.

## COUNT SIX:  CONSPIRACY

116.    Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-115 as if fully set out herein word for word.

117.    As stated previously, personal jurisdiction of this Court is based on each individual Defendant's and each corporate Defendant's conduct, dealings and contacts with the state of Arkansas.

118.    Plaintiff Brown based on the above facts also alleges a civil conspiracy for *in personam* jurisdiction over all Defendants.

119.    Any act done or declaration made by one of the conspirators in furtherance, aid, or preparation of the alleged conspiracy may be shown as evidence against his or her fellow conspirators.

120.    The individual Defendants named herein, through a combination or confederacy, formed for the purpose by their joint efforts with the corporate Defendants to avoid or minimize liability and damages under Smith's insurance coverage are liable to Brown in damages as the jury will find will fairly compensate Brown.

121.    Each Defendant, as a co-conspirator, knew the purpose of avoiding liability and the payment of a just claim that was due, but agreed nonetheless to become a party to the plan (chain conspiracy) to effectuate that purpose.

122.    The conspiracy, the agreement to cooperate and participate in their respective roles in the avoidance of liability under Smith's automobile insurance policy constitutes a *chain conspiracy*. That is, the conspiracy of the participants, defendants, is characterized by different

activities carried on with the same subject of conspiracy in a chain-like manner that each conspirator in a chain-like manner performs a separate function which served in the accomplishment of the overall conspiracy.

123.    The conspiracy which is comprised of each individual Defendant, Smith, Gwinn, Safeco and Enterprise constitutes a civil conspiracy, a concerted or combination of effort to cause injury to Plaintiff Brown, to his person and property, which resulted in damage to his person and property as described herein.

124.    To corroborate the conspiracy is the comity among and between the individual Defendants to avoid liability and the payment of a fair amount on damages under Smith's automobile insurance policy.

125.    Each corporate Defendant, out of deference and good will to each of the individual Defendants, affirmed the conduct of each other without objective regard to the validity of their acts.

## COUNT SIX:  CLAIM FOR PUNITIVE OR EXEMPLARY DAMAGES

126.    Plaintiff realleges, restates, and reiterates each and every previous allegation in paragraphs 1-125 as if fully set out herein word for word.

127.    Plaintiff Brown seeks punitive or exemplary damages against all Defendants for the willful malicious act or acts, and intentional misconduct of the agents and employees of Defendants Safeco and Enterprise in not processing and paying the rightful claims of Brown.

128.    Plaintiff Brown reserves the right to amend this Complaint pending the completion of discovery.

WHEREFORE, Plaintiff, Robert Edmond Brown, prays that he be awarded monetary damages against Defendants, Carolyn Gwinn and Lenora Ann Smith, jointly and severally, on all

Counts in an amount more than is required for federal diversity jurisdiction; that he be awarded monetary damages against Defendants Safeco and Enterprise, jointly and severally in an amount more than is required for federal diversity jurisdiction; that damages in favor of Brown on his Civil RICO claim be trebled; for all monetary damages allowed by the jury on each and every other claims asserted including punitive damages, together with interest on all liquidated amounts as above requested, for his litigation costs and attorney's fees; and for all other just and proper relief to which he may be entitled either in law or equity;

FURTHER pursuant to 18 U.S.C. § 1964 (a) and (c), Plaintiff requests judgment against all named Defendants as follows:

That this Court find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in and whose activities did affect interstate and foreign commerce in violation of 18 U.S.C. § 1962 (b);

That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits or advantages attributable to all violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff treble damages under authority of 18 U.S.C. § 1964 (c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequences of Defendants several violations of 18 U.S.C. § 1962 (b), according to the proof;

That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein, including, but not limited to, all necessary research, all nonjudicial enforcement, paralegal expenses and reasonable attorney's fees; and

Grant such other and further relief as is equitable and just.

JURY TRIAL REQUESTED.

Respectfully submitted,

LARRY J. STEELE PLC

By: _____

LARRY J. STEELE (78146)
225 West Elm Street
P.O. Box 561
Walnut Ridge, AR  72476-0561
(870) 886-5840
(870) 886-5873 fax
email:  steelelaw7622@sbcglobal.net
*Attorney for Plaintiff,*
*Robert Edmond Brown*